[No. 9953.   Department Two.   June 3, 1912.]

## COLLIGNON & COMPANY, *Appellant*, v. HAMMOND MILLING COMPANY, *Respondent*.[1]

CUSTOM AND USAGES—NOTICE. A custom that is not so universal as to charge a party with notice thereof, and which was not brought home to him, cannot operate to change the terms of a contract.

SALES—WHEN TITLE PASSES—DELIVERY OF BILL OF LADING. Where a cargo of wheat was consigned to the shipper's order, and bill of lading assigned to the buyer was placed in a bank with a sight draft on the buyer for the purchase price, the title to the wheat passed on payment of the draft and delivery of the bill of lading to the buyer.

SALES—BREACH—SHORT WEIGHT—EVIDENCE—SUFFICIENCY. Findings against a claim of short weight on a cargo of wheat are not contrary to the preponderance of the evidence, where the evidence on the one hand consisted of the bill of lading acknowledging receipt by the steamship company of the weight as per contract, no one testifying that it was weighed before shipment, while a buyer testified that on arrival the shortage was 27,884 pounds, no one testifying that the wheat was actually weighed.

SALES—WHEN TITLE PASSES—INJURY TO GOODS—BURDEN OF PROOF. Where the title of a cargo of wheat passed to the buyer on payment of the price and delivery of the bill of lading while the ship was at sea, in an action for sea damage, the burden of proof is upon the plaintiff to show that the loss occurred before the title passed; and in the absence of proof as to the time, the plaintiff must fail.

Appeal from a judgment of the superior court for King county, Prigmore, J., entered April 11, 1911, upon findings in favor of the defendant, in an action on contract, after a trial to the court. Affirmed.

*Allen & Allen*, for appellant.

*Kerr & McCord*, for respondent.

[1]Reported in 123 Pac. 1083.

ELLIS, J.—The plaintiffs Collignon & Company, merchants, of Guadalajara, Mexico, contracted to purchase from the defendant, whose place of business was Seattle, Washington, 300 tons of wheat, one-half of which was grade No. 1, at a price of $43 per ton of 2,000 pounds, and one-half of grade No. 3, at a price of $40 per ton. The sale was what is known in trade as a c. i. f. sale, that is, the prices included the invoice cost, the cost of insurance, and the freight from Seattle to Manzanillo, a Mexican port near Guadalajara. The contract was embodied in certain letters and telegrams, the material purport of which was as follows:

In December, 1909, the plaintiff by letter requested defendant to quote its lowest price on wheat and send samples of different grades, the price to be "c. i. f. Manzanillo," and expressed a preference that shipments be made with the Jebsen line. On January 4, 1910, the defendant forwarded samples and quoted prices. Other telegrams passed between the parties, and finally, on January 26, the plaintiff wired an offer of $43 per ton for sample No. 1, and $40 per ton for sample No. 3, stating "prices c. f. & i., are Manzanillo." On February 1, the defendant accepted this offer by a telegram as follows: "We accept the offer, 300 tons shipment during last half February, 300 shipment during last half March, each shipment half sample one, half sample three." This acceptance was three days later confirmed by letter.

The first shipment of 300 tons, half of each specified grade, was made by the steamship "Ella," of the Jebsen line, on February 23, 1910. The bill of lading, so far as material, read:

"Received from Hammond Milling Company, in apparent good order and condition, except as noted . . . 2,244 bags of wheat . . . to be carried . . . to Manzanillo . . . and there at vessel's tackles and in like condition to be delivered unto order Hammond Milling Co., notify Eduardo Collignon & Co., Guadalajara, Mexico."

The defendant procured insurance in the usual form cov-

ering the shipment in its own name as insured. The policy and the bill of lading, assigned to the plaintiffs, the defendant placed in a Seattle bank, with a sight draft on the plaintiffs for the purchase price, including cost of freight and insurance for delivery to plaintiffs upon payment of the draft. These papers were forwarded by the Seattle bank to a bank at Guadalajara, Mexico, where the draft was paid, and the policy and bill of lading were delivered to the plaintiffs on March 7, 1910. At the time of the shipment, the defendant mailed direct to the plaintiffs an invoice stating "terms, sight draft, c. i. f. Manzanillo . . . B. L. 'from Hammond Milling Co., to order, notify Eduardo Collignon & Co., Guadalajara, Mexico.' " When the shipment reached Manzanillo on March 15, 1910, it is claimed by the plaintiffs that it was both short in weight and badly damaged by sea water. The plaintiffs notified the defendant directing it to notify the insurance company of the damage. It seems to be admitted that the insurance company was not liable for sea damage under the terms of the policy. On April 26, 1910, the damage then being fully ascertained by appraisers appointed by the customs authorities at Manzanillo, the plaintiffs forwarded an itemized claim for damages to the defendant, with a request for payment, which defendant refused; whereupon this action was brought.

The answer consists of denials and an affirmative defense that, under the contract of sale, as construed by the custom of merchants prevailing on the Pacific coast touching c. i. f. shipments to Mexico, South America, and the Orient, this shipment was at the risk of the purchaser. The plaintiffs demurred to the plea of custom. The demurrer was overruled. The cause was tried to the court without a jury. From a judgment for defendant, the plaintiffs appeal.

The appellants contend that the court erred in admitting evidence of the custom pleaded. It is upon this question that the contest is mainly waged in the respective briefs, the appellants contending that the taking of the bill of lading and

insurance policy in the respondent's name and banking it with the sight draft was a reservation of title in the respondent until the draft should be paid, that the loss should fall upon the owner, and that this constituted an express contract which could not be varied by evidence of a custom to the contrary. The respondent contends, in effect, that the sale was completed and the title passed to the appellant as soon as the offer was accepted and the wheat loaded upon the vessel; that the taking of the bill of lading and insurance policy in respondent's name was as a mere security for the purchase price, and that evidence of the custom that in such cases the risk should fall upon the purchaser was admissible in determining the intention of the parties.

There is nothing in a c. i. f sale differentiating it from other sales, so far as the question under consideration is concerned. The distinguishing feature of such a sale is that the contract price includes the costs of insurance and the freight to destination in addition to the invoice cost of the goods. An offer and acceptance on that basis, therefore, does not, more than in other sales, determine as between buyer and seller when or where the title to the goods passes from buyer to seller. That depends upon the intention of the parties to be determined as in other cases.

Benjamin on Sales, after a thorough discussion of the English authorities, lays down certain established principles which, so far as here pertinent, are as follows:

"First.—Where goods are delivered by the vendor, in pursuance of an order, to a common carrier for delivery to the buyer, the delivery to the carrier passes the property, he being the agent of the vendee to receive it, and the delivery to him being equivalent to a delivery to the vendee. . . .

"Thirdly.—The fact of making the bill of lading deliverable to the order of the vendor is, when not rebutted by evidence to the contrary, almost decisive to show his intention to reserve the *jus disponendi*, and to prevent the property from passing to the vendee.

"Fourthly.—The *prima facie* conclusion, that the vendor reserves the *jus disponendi* when the bill of lading is to his

order, may be rebutted by proof that in so doing he acted as agent for the vendee, and did not intend to retain control of the property; and it is for the jury to determine as a question of fact what the real intention was. . . .

"Sixthly.—That where a bill of exchange for the price of goods is inclosed to the buyer for acceptance, together with the bill of lading, the buyer cannot retain the bill of lading unless he accepts the bill of exchange; and if he refuse acceptance, he acquires no right to the bill of lading, or the goods of which it is the symbol. And the vendor may exercise his *jus disponendi* by selling or otherwise disposing of the goods, so long at least as the buyer remains in default. . .

"Eighthly.—When the vendor deals with the bill of lading only to secure the contract price, as *e. g.* by depositing it with bankers who have discounted the bill of exchange, then the property vests in the buyer upon the payment or tender by him of the contract price." Benjamin, Sales (7th ed.), § 399.

The American note appended to the text above quoted sustains the view that the same principles are recognized by the weight of American authority. If the *prima facie* conclusion that the vendor reserves the *jus disponendi* by taking the bill of lading to his order may be rebutted by proof of a contrary intention, then it would seem that evidence of the custom to the contrary was properly admissible to aid in determining the intention of the parties.

We find it, however, unnecessary to labor this question by a review of the numerous authorities cited, since the evidence failed to establish such a custom as would be binding upon the appellants. There was no evidence that the custom ever prevailed at the port of Manzanillo, or that the appellants ever had knowledge of such custom anywhere. All of the appellants' witnesses testified that there was no such custom. The evidence was not sufficient to establish the claim that the custom was so universal as to charge the appellants with knowledge of it, nor was knowledge of the custom brought home to the appellants in any other way. The evidence was insufficient to overcome the *prima facie* conclusion that the respondent, by taking the bill of lading in

its own name, reserves title to itself until payment of the draft.

In any event, it cannot be questioned that the title passed to the appellants when the draft was paid and the bill of lading and insurance policy delivered on March 7, 1910, even though the evidence failed to show an intention of the parties that it should pass upon the loading of the cargo at Seattle. In any view of the case, the burden was upon the appellants to prove that the damage occurred prior to that time. The court found that when the cargo was sea damaged did not appear from any testimony in the case. This finding is sustained by the record. The only hint on this point is in the letter of the appellants demanding damages from the defendant, which refers to a "protest" made by the captain of the "Ella" at San Francisco on March 4, 1910, and states that a copy of the protest accompanied the letter. It is stated in appellants' brief that this protest described a terrific storm encountered by the ship prior to that date causing damage to the ship and cargo. We find no evidence to sustain this statement. The protest itself was not introduced in evidence, and we find nothing in the record showing its nature or disclosing its contents. The appellant failed to prove that the sea damage occurred at any time prior to the payment of the sight draft and passage of title to the appellant. There being a failure in this essential element of proof, the judgment of the court, so far as the claim for sea damage was concerned, was clearly correct.

There remains to be considered only the claim for short weight. The evidence on the one hand consisted of the bill of lading acknowledging receipt by the steamship company of the wheat in weight as per contract, and the invoice which agreed with the bill of lading. No one testified that the wheat was actually weighed before shipment. On the other hand, G. Collignon, a member of the appellant firm, testified that when the wheat arrived at Manzanillo there was a shortage of 27,884 pounds. No one testified that the wheat was

actually weighed on its arrival at that port, or at the time of the appraisement. Upon this evidence the court found that the full amount of wheat was loaded upon the vessel at Seattle. We cannot say that there was a preponderance of evidence against this finding.

A most careful consideration of all the evidence leads us to the conclusion that the plaintiffs failed to sustain the burden of proof incumbent upon them, in any view of the principles of law involved. The judgment is affirmed.

DUNBAR, C. J., FULLERTON, MOUNT, and MORRIS, JJ., concur.